# Tennessee Coal, I. & R. R. Co. *v.* Wiggins.

### Injury to Servant.

(Decided November 30, 1916.  73 South. 516.)

1. **Master and Servant; Injury to Servant; Plant.**—A "jack-pole" and wire cable used to hold a coal-mining machine in position were parts of the "plant" of the coal-mining company within the meaning of subd. 1, Employers' Liability Act (Sections 3910-3913, Code 1907).

2. **Same; Defective Condition; Jury Question.**—Under the evidence in this case it was a jury question whether the wire cable holding the coal-mining machine in position was worn, and whether the operator of the machine, to whose orders plaintiff was subject, had sufficient time and opportunity by proper inspection to discover any defective condition.

3. **Same; Direction by Superior; Jury Question.**—Under the evidence in this case it was for the jury to determine whether when plaintiff was injured he was told to unload the coal-mining machine, to set up the "jack-pole" and to hold it.

4. **Same; Superintendence; Negligent Order; Jury Question.**—It was for the jury under the evidence in this case whether the order, if given by the operator of the machine, was a negligent order of the superintendent of plaintiff.

5. **Same; Evidence.**—The operator of the machine being a witness it was competent to ask him on the cross whether it was not customary for him to notify his helper (the plaintiff in this case) that he was getting ready to throw in the bits of the machine so that the helper could get out of the way and also the answer that the operator always said he was putting in the bits, since such evidence was relevant under defendant's plea of contributory negligence.

6. **Same.**—The operator having testified that he was not in reach of the "jack-pole" to catch hold of it with one hand and let plaintiff get out of the way when the machine began cutting the coal, it was competent on the redirect examination of the plaintiff to permit him to testify that the operator of the machine did not tell him that he was getting ready to throw the bits in and did not stop the machine when he was ready to do so.

7. **Appeal and Error; New Trial; Review.**—The refusal of the trial court to grant a new trial because of insufficiency of the evidence or because verdict was contrary to the evidence will not be disturbed on appeal unless, after allowing all reasonable presumption of the correctness of the verdict the preponderance of the evidence against it is so decided as to convince the court that it is wrong and unjust.

APPEAL from Bessemer City Court.

Heard before Hon. J. C. B. GWIN.

Action by James Wiggins against the Tennessee Coal Iron & Railroad Company for injuries suffered while in its employment. Judgment for plaintiff and defendant appeals.  Affirmed.

PERCY, BENNERS & BURR, for appellant. GOODWYN & ROSS, for appellee.

THOMAS, J.—The case was tried on counts 3 and 11, which counts were, respectively, under subdivisions 1 and 3 of the Employers' Liability Act (Code 1907, § 3910). The defendant pleaded the general issue and contributory negligence.

The accident occurred in connection with the operation of a coal-cutting machine in a mine. This machine was an electrically driven device, which makes an incision in the seam of coal, three or four inches wide at the bottom and running across the width of the room. A blast is put in at the top of such seam, the result being that when the blast is set off the coal is blown out, because of the incision cut. ·The bar or arm of this cutting machine, on which the saws, teeth, or bits, which cut the coal, run, moves laterally as the cutting proceeds. The machine is held in place during its operation by, a wire cable which runs from it to an iron rod or pole. This road or pole is sharpened at both ends, and one end is inserted in the roof and the other end in the floor of the mine. Notches are made in the roof and in the floor of the mine, to hold this pole in place. To operate the machine in cutting the coal, two men are required. One, known as the machine runner, operates the levers which control the electric power driving the machine, and determines the movements of the machine while in operation. The other man is known as the helper to this operator. This helper sets up and holds said iron role or pole from which runs the wire cable to the machine, and he is subject to the orders of the operator or machine runner. This iron rod or pole, the use of which is above described, is called a "jack pole" or "jack pipe." The coal-cutting machine weighs about 5,000 pounds, and, while cutting the coal, runs its bits or teeth or saws at the rate of about 800 feet per minute, and subjects the jack pole and the wire cable to a strain of "something like 4,000 pounds," which strain is on the wire cable and the bottom of the jack pole.

In the instant case, the machine runner or operator was named Barrett, and his helper was the plaintiff. No other person was present when the injury occurred. On that occasion, the machine had been brought into the room for its operation therein; and the plaintiff's testimony is to the effect that Barrett stated that the room was not sufficiently cleared of coal for the operation of the machine therein; that Barrett called a third party,

to whom he made complaint that the room was not properly cleared of coal, and said that he (Barrett) "had a mind not to cut the place, but that he would do it."

Plaintiff's testimony tends further to show that, on the occasion of his injury, he was subject to the orders of the operator, Barrett, who told him where to place the jack pole; that he so placed it, and the operator started the machine, and began to "pull the machine to the face [of the coal], and before he got to the face—against the face—he put the bits into the machine;" and that Barrett told plaintiff to hold the jack pole, which witness tried to do as so directed, by putting all his weight against it; that, about the time the machine (the teeth or bits) began to grip the coal, the jack pole which plaintiff was holding began to slip at the bottom; that Barrett ordered him to hold it, while it was slipping, and Barrett kept running the machine; that the pressure on the cable jerked the jack pole through or on the floor of the mine and knocked the plaintiff into the machine, and the cable caught his foot and jerked it into the teeth or bits of the machine, which cut his foot as indicated. Plaintiff further testified that, so far as he could see, Barrett made no effort to stop the machine after plaintiff fell and before he was injured; that Barrett had charge of the machine and its operation; and that plaintiff as his helper was "entirely under his directions." Plaintiff's testimony as to the condition of the wire cable extending from the jack pole to the coal-cutting machine, which cable held the machine against the face of the coal, was that it was pretty badly worn from use, and that it had broken strands of wire in it.

The evidence for the defendant tends to show that with a pressure of about 4,000 pounds on the cable and jack pole, while the machine is in operation, the usual life of the wire cable is about three weeks; that the cable in question was a new one and was put in only two days before, that it was not worn from use, and that there were no broken strands of wire thereon; and that on the occasion of the injury of plaintiff the jack pole did not jerk out at the bottom, or floor, and fall, but was still standing in place at the time of, and immediately after, the accident.

(1) The trial court sent up to this court for inspection the photographs of such machine in operation. The office of the jack pole, to which is attached the wire cable extending to the machine, is clearly indicated by these photographs. This jack pole and wire cable were parts of the plant of the defendant.—*Sloss-*

[Tennessee Coal, I. & R. R. Co. v. Wiggins.]

*Sheffield Co. v. Mobley,* 139 Ala. 425, 36 South. 181; *Huyck v. McNerney,* 163 Ala. 244, 50 South. 926; *Roden Coal Co. v. Ravarono,* 186 Ala. 200, 65 South. 334; *Riddle v. Bessemer Soil Pipe Co.,* 170 Ala. 559, 54 South. 525.

In *Epsey v. Cahaba Coal Company,* 186 Ala. 160, 64 South. 753, this court said: "We have ruled that 'wear' of a part of an instrumentality is some evidence of the existence of a deficit in condition of such long standing as to support a finding of such want of due care and diligence, either in discovering the defect in condition or in remedying it, as amounts to negligence."— *A. G. S. R. R. Co. v. Yount,* 165 Ala. 537, 543, 51 South. 737; *B. R. M. Co. v. Rockhold,* 143 Ala. 115, 126, 42 South. 96.

(2) On the evidence before us, it cannot be affirmed, as a matter of law, that this cable was not worn, and that a proper inspection of it would not have disclosed its defective condition. It cannot be affirmed as a matter of law that there was no evidence that Barrett, who had the control and operation of the machine for defendant (and to whose orders plaintiff was subject), had not sufficient time and opportunity to discover by proper inspection any defective condition that may have existed in this cable. The evidence was sufficient to carry the case to the jury.—*Roden Coal Co. v. Ravarono, supra; Epsey v. Cahaba Coal Co., supra; Amerson v. Corona Coal Co.,* 194 Ala. 175, 69 South. 601; *Tobler v. Pioneer Co.,* 166 Ala. 517, 52 South. 86; *T. C., I. & R. R. Co. v. Stevens,* 115 Ala. 461, 22 South. 80; *B. R. M. Co. v. Rockhold, supra; Riddle v. Bessemer Soil Pipe Co., supra.*

The eleventh count is under the third subdivision of the Employers' Liability Act, and, after describing how the machine was used and operated, this count proceeds with the further averment: "That while he was then and there engaged in the discharge of the duties of the said employment he was attempting to hold in position said jack pole, which then and there jerked loose from its fastenings while said machine was in operation, and the plaintiff was thereby jerked and thrown or caused to fall against the cutting part of said electrical coal-cutting machine, and a large part of his foot was then and there cut off by the machine, and as a proximate result of said injury he has suffered," etc. (specifically describing his injuries). "And the plaintiff says that his said injury and damage are the proximate result of the negligence of one Riley Barrett, whose name to the plaintiff is otherwise unknown, who was then and there in the service or employment of the defendant, and to whose orders or

directions the plaintiff at the time of his said injuries was bound to conform and did conform, and such injuries resulted from his having so conformed. And the plaintiff says that the said negligence of the said Barrett consisted in this: That he then and there negligently ordered or directed the plaintiff to hold such jack pole in position while said machine was in operation, which it was highly dangerous for this plaintiff to do."

Appellant's contention as to the evidence under the eleventh count is that Barrett was only ordering appellee to do what he was employed for, under the ordinary and usual conditions. On the other hand, appellee contends that Barrett ordered him to do the thing he was doing at the time of the injury, and that it was an unusual and extraordinary condition in which he was placed by his compliance with Barrett's orders; that his injury was caused by reason of the negligence of Barrett, in so ordering him "to hold the jack pole" under the circumstances of extraordinary peril; that to Barrett's orders and directions at the time of the injury he was bound to conform and did conform; and that his said injury so resulted from his having so conformed to Barrett's negligent orders.

Defendant's testimony tended to show that the duty of the helper was to hold the jack pole, to shovel the coal cut, to keep the machine free and from choking down, to move the truck down and to load up, and to oil the bits; that he was to do the work the operator or runner of the machine told him to do, unless it was against the rules of the company.

(3, 4) Plaintiff's version of the duties of the helper was "to help the machine runner and do whatever he was directed to do" by such machine runner. Whether, on the occasion of his injury, plaintiff was told to unload the machine and set up the jack pole, as indicated, and to hold the same, was, under the circumstances disclosed by the plaintiff's evidence, a question for the jury. So, also, was the question whether this order, if given by Barrett, was a negligent order of plaintiff's superintendent.—*U. S. C. I. P. & F. Co. v. McCoy,* 196 Ala. 45, 71 South. 406; *Republic Iron & Steel Co. v. Quinton,* 194 Ala. 126, 69 South. 604.

(5) The third assignment of error challenges the ruling of the court in permitting plaintiff's counsel, in cross-examination, to ask Barrett, as a witness for the defendant, the following question: "I will ask you if it is not customary for you to notify him at the time that you have gotten the machine up to the face of the coal ready to throw the bits in, to notify him that you are

[Tennessee Coal, I. & R. R. Co. v. Wiggins.]

getting ready to throw the bits in so that he can get out of the way?"

The witness answered, over defendant's objection: "He is not in the way at all, but when you throw your bits in it is customary to stop the machine. If you don't, you break the bit clutch. If you throw it in, you are liable to break the bit clutch, which is a big expense to fix. I always say, 'Jim, I am putting the bits in.'"

The person thus referred to as "Jim" was the plaintiff. The trial court committed no error in allowing the question and answer on cross-examination. The testimony was relevant under defendant's plea of contributory negligence. If it was Barrett's custom to put plaintiff on notice when the teeth or bits were to be thrown into the coal, it would tend to illustrate plaintiff's conduct in guarding himself against the usual and ordinary peril of such operation of the machine, and to shed light on the inquiry whether he contributed by his negligence to his own injury. The testimony further tended to illustrate Barrett's conduct in ordering plaintiff "to hold and not turn loose the jack pole," after the pole had begun to slip or cut in the floor of the mine, and the machine to jump.

The testimony was somewhat in conflict as to whether the machine was cutting, and, if so, how long it had been cutting, when the injury was sustained. Defendant's evidence tended to show that the teeth or bits had cut into the coal from four inches to a foot, and that the injury did not occur as the machine was started. Barrett said, however, on cross-examination, that the machine "had been running about a minute when he got hurt—just about a minute" (meaning when plaintiff was injured).

The plaintiff's account of the accident was more in detail: "Yes, sir; it jerked six inches at the time maybe, and jerked plumb through. It knocked me into the machine. As it knocked me I tried to catch myself, and I was thrown right against the machine nearly, then, and the rope caught tight on my shoe lace along there (indicating), and, just as it caught, the machine jerked backwards and jerked my foot into the bits. That was after the jack pipe hit me and jerked me into the bits. It cut my foot then. * * * After he fell and before he was cut, Mr. Barrett did not stop the machine. He did not know why Mr. Barrett made no effort to stop it before he was cut, so far as he saw. He had no authority or control over Mr. Barrett at all.

[Tennessee Coal, I. & R. R. Co. v. Wiggins.]

Mr. Barrett had charge of me and the work and the machine. * * * My foot wasn't in the bits but a short time. It was there longer than the snap of your finger. * * * After this jack pipe come out and knocked me loose from here where I was standing towards this machine, and this wire cable would curve up in hooks like, and caught my foot dangling in it, and the machine jumped, and just as I got dangling in the rope, this wire hung on my shoe and jerked me into the machine; the machine jumped and carried me in it. * * * The witness stated that the machine at the time his foot was cut had started to cut into the coal something like six or eight inches or a foot; that he couldn't say how far, as he was hurt and carried out in a minute."

(6) The sixth assignment of error is predicated on the court's ruling in admitting testimony on redirect examination of the plaintiff. On the cross-examination of Barrett, the plaintiff had asked the question:

"Q. Mr. Wiggins, look at that picture No. 4, and hold it there so the jury can see that picture. Now, I want to ask Mr. Barrett one question. Mr. Barrett, I will ask you if it wasn't customary, when you got your machine up to the face of the coal and began cutting the coal, that then you would reach up and catch hold of the jack pole with one hand and let your helper get out of the way? A. When he wasn't in reach of it? Q. I say whenever you got in reach of the jack pole. A. In this case I wasn't in reach of the jack. Q. What was the custom when you were in reach?"

Plaintiff was then permitted to be recalled as a witness in his own behalf, and by his counsel he was asked:

"Did Mr. Barrett tell you at the time that the teeth or the bits of the machine were thrown into the coal there, 'Look out,' that he was 'going to throw it in,' or words to that effect? * * * No, sir. * * * Did he or not stop his machine at the time he was ready to throw the bits into the coal? * * * No, sir."

When all the testimony is considered, the plaintiff's injury and the beginning of the cutting of the coal, were of sufficiently close proximity to make it a material question for the consideration of the jury whether the plaintiff was notified according to custom of the increased danger of throwing the teeth into the coal and thereby increasing the strain on the wire cable and jack pole, and whether Barrett stopped the machine at the time he was ready to throw the bits in the coal. Moreover, plaintiff had

testified without objection by defendant of Barrett's custom to so notify him. The trial court committed no error in admitting the testimony.

There is no assignment of error based on the court's refusal to give defendant's charge No. 7. Defendant, however, had the benefit of that instruction in its given charge No. 2.

(7) The court overruled the motion for a new trial, and this ruling is assigned as error. Refusal to grant a new trial because of insufficiency of the evidence, or because the verdict was contrary to the evidence, will not be reversed unless, after allowing all reasonable presumptions of the verdict's correctness, the preponderance of the evidence against it is so decided as to clearly convince the court that it is wrong and unjust.—*N. C. & St. L. Ry. v. Crosby*, 194 Ala. 338, 70 South. 357; *Cobb v. Malone*, 92 Ala. 630, 9 South. 738; *L. & N. R. R. Co. v. Byrd, infra*, 73 South. 514.

We believe that the judgment of the city court of Bessemer should be affirmed.

Affirmed.

ANDERSON, C. J., and MAYFIELD and SOMERVILLE, JJ., concur.